UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOLON MOTOR AND COIL CORPORATION, | ) ) ) |
| Plaintiff, | ) No. 16 C 03545 ) |
| v. | ) ) Judge Edmond E. Chang |
| NIDEC MOTOR CORPORATION, | ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Molon Motor and Coil Corporation sued Nidec Motor Corporation for, among other things, violation of the federal Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, 130 Stat. 376, and the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*. R. 64, Third Am. Compl.[1] Molon contends that its former Head of Quality Control, Manish Desai, copied confidential data onto a portable data drive before taking up a new job at Molon's competitor, Merkle-Korff (which eventually became Nidec). *Id.* ¶¶ 58-65. Molon further alleges that Nidec, a direct competitor, has used and continues to make use of the secrets that Desai downloaded. *Id.* ¶¶ 66-67. Nidec now moves to dismiss the trade secrets claims (which are the only remaining counts of the complaint),[2] arguing that there was nothing unlawful about Desai copying the files while he was still a Molon employee and that there is no plausible allegation

---

[1]Citations to the docket are indicated by "R." followed by the docket entry.
[2]In the operative complaint (the Third Amended Complaint), Molon also brought two counts of patent infringement, but one of those counts (Patent No. 6,465,915) was defeated on summary judgment, R. 78, 3/29/17 Opinion and Order, and the other (Patent No. D451,072) was dismissed through a joint stipulation, R. 75, Joint Stipulation of Dismissal of Design Patent Claims.

that Nidec has used the trade secrets contained on the thumb drive.[3] R. 68, Nidec's Mot. to Dismiss, at 1-2, 6-7. For the reasons stated below, Nidec's motion is denied.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Third Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nidec is the successor corporation to Merkle-Korff Industries, Inc., which in 2016 merged with Nidec Kinetek Corporation. Third Am. Compl. ¶ 4. Nidec Kinetek then ultimately merged with Nidec Motor Corporation, the defendant in this case. *Id.*

Molon makes bespoke fractional and sub-fractional electric motors and gearmotors for customers across various industries, such as manufacturers of vending machines, refrigerator ice makers, and breast pump motors. Third Am. Compl. ¶¶ 55, 66. It also makes standardized, off-the-shelf motors that are widely distributed. *Id.* ¶ 66. According to Molon, Nidec competes in precisely the same industries, battling for market share in both the custom and standardized motor markets. *Id.*

Before June 2013, Manish Desai served as Molon's Head of Quality Control. Third Am. Compl. ¶ 58. In this position, he oversaw product liability testing, coordinated the production of engineering data, and processed quality assurance test results as well as other compliance paperwork. *Id.* ¶ 61. As a condition of getting that job, he signed an employment agreement which included at least one

---

[3]This Court has subject-matter jurisdiction over the federal trade secrets claims under 28 U.S.C. § 1331 and 1338(a). Supplemental jurisdiction applies over the state trade secrets claim, 28 U.S.C. § 1367, because the state-law claim is part of the same case or controversy as the federal trade secrets claim.

2

restrictive covenant banning the unauthorized use of company data. *Id.* ¶¶ 57, 60. According to Molon, Desai's job put him in a position to access "all of Molon's trade secrets and confidential business information" through his work computer. *Id.* ¶ 64.

In June 2013, Desai left Molon for Nidec. Third Am. Compl. ¶ 58. But before leaving, he allegedly copied dozens of Molon's engineering, design, and quality control files onto a personal Kingston portable data drive.[4] *Id.* ¶ 65; R. 65, Appendix to Third Am. Compl. Desai downloaded motor design and engineering drawings, motor production inspection protocols, data on motor production tools, quality control test protocols, quality control testing data and reports, and communication files with customers. Appendix to Third Am. Compl.[5]

After making these data transfers to his own thumb drive, Desai then moved to a new job at Merkle-Korff (Nidec's predecessor), taking up responsibilities similar to those he had at Molon. Third Am. Compl. ¶ 67. Without identifying specific instances, Molon alleges (on information and belief) that Desai "unlawfully disclosed" the trade secrets he took from the memory stick to Nidec and that Nidec used and continues to use that information. *Id.* ¶¶ 59, 67, 71, 79.

Nidec's dismissal motion primarily argues that Molon has failed to state a plausible claim because Desai's actions, even as alleged, do not constitute "misappropriation" under either the Illinois Trade Secrets Act or the Defend Trade Secrets Act of 2016. Nidec's Mot. to Dismiss at 1-2, 6. Nidec goes on to contend that

---

[4]Molon is emphatic that its company does not use portable data drives. Third Am. Compl. ¶¶ 56, 69.

[5]In its Appendix to the Third Amended Complaint, Molon provides file names and brief descriptions for the data copied by Desai.

3

there is no ground for inferring that it accessed or used any of the information Desai pulled. *Id.* at 7-9. And finally, Nidec argues that even if Desai did take trade secrets and gave them to Nidec, all of that occurred before the effective date of the Defend Trade Secrets Act, so at least the federal claim must be dismissed. *Id.* at 9-10.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Allegations that are entitled to the

assumption of truth are those that are factual, instead of mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

In Count 3 of its Third Amended Complaint, Molon accuses Nidec of violating the federal Defend Trade Secrets Act of 2016. Third Am. Compl. ¶¶ 55-72. And in Count 4, Molon contends Nidec also ran afoul of the Illinois Trade Secrets Act. *Id*. ¶¶ 73-81. For both of these claims, Nidec says that the complaint does not adequately allege (1) that Desai downloaded the information via "improper means" under the relevant statute; or (2) that Nidec has used the alleged trade secrets. The federal and Illinois claims can be discussed together because the pertinent definitions of the two acts overlap.

The Defend Trade Secrets Act of 2016 allows "[a]n owner of a trade secret that is misappropriated … [to] bring a civil action … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).[6] For the purposes of this Act, "misappropriation" is either: "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "(B) disclosure or

---

[6]A "trade secret" for this Act is defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. §1839(3).

5

use of a trade secret of another without express or implied consent" under certain conditions.[7] *Id.* § 1839(5). "[I]mproper means," in turn, is defined here as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6).[8]

Similarly, the Illinois Trade Secrets Act authorizes a civil action for "[a]ctual or threatened misappropriation[s]" of trade secrets.[9] The Illinois Act defines "misappropriation," "improper means," and "trade secrets" very similarly, and for purposes of this dismissal motion, the slight differences are immaterial."[10] *Compare*

---

[7]A person will be liable for misappropriation by disclosure if the person either:

(i) used improper means to acquire knowledge of the trade secret;
(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
    (I) derived from or through a person who had used improper means to acquire the trade secret;
    (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
    (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
(iii) before a material change of the position of the person, knew or had reason to know that—
    (I) the trade secret was a trade secret; and
    (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).

[8]The "improper means" definition section also explicitly specifies that "reverse engineering, independent derivation, or any other lawful means of acquisition" do not count as improper means. 18 U.S.C. § 1839(6).

[9]On injunctive relief: "Actual or threatened misappropriation may be enjoined." 765 ILCS 1065/3(a). On damages: "In addition to the relief provided for by Section 3, a person is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." *Id.* § 1065/4(a).

[10]For the Illinois Act, trade secret is "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from

765 ILCS 1065/2(a), (b), (d), *with* 18 U.S.C. § 1839(3), (5), (6). For both the federal and the Illinois trade secret statutes, then, the question is whether Molon has plausibly alleged that (1) there are trade secrets (2) that were misappropriated by Nidec.

### A. Trade Secrets

For purposes of the dismissal motion, Nidec does not directly contest that what Desai allegedly put onto a thumb drive could have contained trade secrets. Nidec acknowledges that, in a sealed appendix to the Third Amended Complaint, Molon has added details—file names and summaries—of the alleged stolen trade secrets, but Nidec suggests that these additions do not ultimately change the fact that there remains no "plausible basis for alleging that [Nidec] accessed or used any alleged trade secrets." Nidec's Mot. to Dismiss at 6.

Although not directly contested by Nidec, for the sake of completeness, the Court notes that Molon did sufficiently allege that the downloaded files do comprise trade secrets. To be sure, alleging what trade secrets were misappropriated does require some concreteness and specificity at this stage, but the claims do not need to be as detailed as when the case is going to trial. *See AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 920-21 (N.D. Ill. 2001); *Mobile Mark, Inc. v. Pakosz*, 2011 WL 3898032, at *1 (N.D. Ill. Sept. 6, 2011). Molon's Appendix to the Third Amended Complaint—which lists out file names and summaries of motor design and engineering drawings; protocols for motor production inspection; production data;

---

not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).

7

quality control protocols and testing data; and customer correspondence—provides more than enough detail to plausibly allege that what was downloaded comprises trade secrets. Appendix to Third Am. Compl. Beyond this, Nidec will be free to demand more specifics in interrogatories, and additional discovery will flesh out further facts. But at this dismissal-motion stage, the allegations plausibly assert that Manish Desai downloaded trade secrets.

**B. Misappropriation**

The next question arises from the second half of the federal and Illinois trade secrets acts' "misappropriation" definition: did Nidec know or have reason to know that the trade secret was acquired by "improper means"? Nidec argues that Desai's behavior does not fit this definition. Nidec's Mot. to Dismiss at 6. It contends that Desai's access to the files in the Molon computer system was authorized. *Id.* To Nidec's way of thinking, nothing improper happened because Desai was still an employee when he put the data on the thumb drive, and used his normal username and password to get access. *Id.* So even if what Desai took was ultimately a trade secret, he did not, in Nidec's view, take it through "improper means." For its part, Molon disagrees. Citing the definition of "improper means" from the trade secret statutes, it argues that Desai's actions qualify as a "breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use." R. 72, Molon's Resp. Br. at 3-4. This confidential relationship and duty to maintain secrecy, Molon avers, was established by Desai's employment agreement with Molon. *Id.* at 4 (quoting Third Am. Compl. ¶ 62 ("Mr. Desai agreed that he would

8

follow this and other restrictive covenants regarding Molon's trade secrets and confidential business information during his employment with Molon and for as long as the confidentiality of trade secrets and proprietary business information were to be maintained under applicable law.")).

Misappropriation can manifest in different ways, but according to the statutory definitions, the method of acquisition needs to be "improper": "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6).[11] If there is nothing "improper" to point to, then the trade secret claim must fail. *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 813 (N.D. Ill. 2011) (rejecting a trade secrets claim in part because Plaintiff "does not argue, and has presented no evidence, that [Defendant] obtained [Plaintiff's] trade secrets through improper means").

Through his employment agreement with Molon, Desai was on notice that he was not to use his company's confidential information for any purpose other than his work there. Third Am. Compl. ¶ 62 ("In the restrictive covenants in his employment agreement, including those concerning trade secrets and confidential information, Mr. Desai agreed that Molon's trade secrets and confidential information … were Molon's sole and exclusive property."). Molon alleges that it has adopted policies and procedures to protect its trade secrets, and insists that it does

---

[11] The language of Illinois' trade secret statute differs slightly: "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a).

9

not provide or use memory sticks for access to its computer network. *Id.* ¶¶ 56, 69. Based on those allegations, it is reasonable to infer (and Molon gets the benefit of reasonable inferences right now) that Desai's use of the thumb drive was not part of the normal course of his employment.[12] That in turn renders plausible Molon's allegation that Desai took the information in order to eventually use it at a competing firm, and that breach of his duty to maintain secrecy readily meets the definition of acquiring trade secrets through "improper means." To be sure, in arguing against a finding of impropriety at a trial, Nidec will point to the fact that Desai downloaded the files when he was a current employee and that he simply used his normal sign-in information when he did it. But those facts are not necessarily inconsistent with downloading the files in order to use them for a competitor. Molon has plausibly alleged that Desai breached a duty to maintain secrecy.

**C. Acquisition or Use**

That brings us to the closest question in the case: even if Desai allegedly acquired a trade secret by improper means, Molon still must adequately allege that *Nidec* acquired or used that secret. Nidec argues that, on this issue, Molon "provides no specific allegations that would plausibly show that Mr. Desai disclosed the alleged trade secrets to [Nidec] or that [Nidec] otherwise obtained and used any information allegedly copied by Mr. Desai." Nidec's Mot. to Dismiss at 7. Molon, on

---

[12]Molon does not, however, plead that it outright banned employees from using memory sticks or bringing them into the workplace. The precise status of Desai's actions in relation to his employment contract and expectations should become clearer with further factual development in discovery.

10

the other hand, argues that it does not need to give specifics on this front, because the disclosure and use can be inferred under the "inevitable disclosure doctrine." Third Am. Compl. ¶ 67; Molon's Resp. Br. at 5-7.

The "inevitable disclosure doctrine" allows a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). In evaluating whether the facts justify this circumstantial-evidence inference, courts consider: "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734-35 (N.D. Ill. 2011); *see also Triumph*, 834 F. Supp. 2d at 809; *Mobile Mark,* 2011 WL 3898032, at *1.[13]

Taking these factors in order, Molon has sufficiently pled at this stage that Nidec is a serious competitor. Molon provides details about the nature of the custom motor market in which it and Nidec compete, as well as the "standard, off-the-shelf"

---

[13]It is worth noting that calling a line of reasoning a "doctrine" poses the risk of ossifying the "factors" into a rigid test. At bottom, whether a trade secret would be inevitably disclosed is really a question of circumstantial evidence, and those types of questions defy straitjacket formulas.

11

market, which is also a competitive arena for both parties. Third Am. Compl. ¶ 66; Molon's Resp. Br. at 6.[14]

On the second factor, Molon has also adequately pled that Desai's position with Nidec is similar to his former position at Molon. Third Am. Compl. ¶ 67; Molon's Resp. Br. at 5-6. Nidec implicitly acknowledged the overlap in Desai's responsibilities between companies in its motion to dismiss, Nidec's Mot. to Dismiss at 8-9,[15] but then later contended in its reply brief that Desai's responsibilities between his two jobs do *not* overlap. R. 73, Nidec's Reply Br. at 8. Setting aside the reply-brief argument,[16] Nidec primarily argues that the real problem with Molon's

---

[14]To reinforce the Third Amended Complaint's allegations, Molon asserts in its response brief that it has lost the business of a specific customer to Nidec. Molon's Resp. Br. at 6 n.2. In some situations, an additional factual allegation, as distinct from an additional claim, might be permissible in a response brief. *See*, *e.g.*, *Milazzo v. O'Connell*, 925 F. Supp. 1331, 1339-40 (N.D. Ill. 1996), *aff'd*, 108 F.3d 129 (7th Cir. 1997) (weighing authority on each side). But the Court need not decide whether the allegation in the response brief should be considered, because the complaint itself contains enough competition detail to survive the dismissal motion.

[15]Instead of taking on the factual allegations, Nidec's dismissal motion cited to three cases to try to undermine the similar-employment element. The citation to *Triumph Packaging Group*, 834 F.Supp.2d at 809, is not illuminating. Nidec's Mot. to Dismiss at 8. Although it is generally true that "the *mere fact* that a person assumed a similar position at a competitor does not, without more," trigger the inference of an inevitable disclosure, *id.* (emphasis added), Molon is not asking the Court to make the decision based on that "mere fact" alone. Nidec's other two citations, *Cintas Corp. v. Perry*, 2004 WL 2032124 (N.D. Ill. Aug. 20, 2004), and *Teradyne, Inc. v. Clear Communications Corp.*, 707 F. Supp. 353 (N.D. Ill. 1989), also do not help much, because they do not deal with the similar-employment element of the inevitable disclosure doctrine. They instead state more generally that mere speculation or fear should not be sufficient to win a trade secrets claim. This caveat is true and important (and is reiterated below), but is not immediately relevant in the similar-employment analysis.

[16]In the reply brief, Nidec's argument conflates other factors (whether an employee admitted to stealing data, whether the employee was involved in design, whether the new employer was facilitating the trade theft, and so on) with the relatively straightforward question of whether Desai's two positions are similar. Nidec's Reply Br. at 7-9. Nidec also cites *Saban v. Caremark Rx, L.L.C.*, 780 F.Supp. 2d at 710, in which it *was* found that an employee's outgoing and incoming positions were different, to argue for the first time that "[t]his is true for Mr. Desai as well," even though Nidec did not otherwise discuss how

12

reliance on inevitable disclosure is that Desai worked (and still works) in quality control rather than design. Nidec's Mot. to Dismiss at 8-9 ("As a quality control engineer at Molon, Mr. Desai was not involved with designing or selling Molon's products. ... There is no allegation that Mr. Desai was designing new products to compete with Molon's products. ... In performing quality-control tests on Merkle-Korff's established commercial products, there would be no use for the alleged secrets that Molon purports were misappropriated."). But the fact that Desai does quality control work, rather than design, is not fatal to triggering the circumstantial inference of inevitable disclosure. Design does not have a monopoly on trade secret cases. Although it might be that many trade secret cases deal with confidential design secrets, many other types of information, featuring employees of all stripes, have been found to fit the bill. *See, e.g.*, *PepsiCo*, 54 F.3d at 1270 ("PepsiCo has not brought a traditional trade secret case, in which a former employee has knowledge of a special manufacturing process or customer list and can give a competitor an unfair advantage by transferring the technology or customers to that competitor. ... This type of trade secret problem [(knowledge of past employer's marketing plans)] may arise less often, but it nevertheless falls within the realm of trade secret protection under the present circumstances.").

Desai was Head of Quality Control at Molon: this was not a limited, low-rung position, but instead a very broad role with a far-reaching set of tasks. Third Am. Compl. ¶ 61. Specifically, Molon alleges that Desai's duties in that role included,

---

Desai's quality control responsibilities at Nidec are different than those he had at Molon. Nidec's Reply Br. at 8.

among other things, "providing quality control engineering, including through product reliability testing," "engaging Molon service personnel to achieve sales and service objectives by providing accurate engineering data," and "providing timely and accurate reports on quality assurance test results as required by Molon management." *Id.* In view of these duties, it is plausible that Desai had access to a wide variety of trade secrets. Indeed, Molon's Appendix to the Third Amended Complaint lists many different types of downloaded files. Some are ostensibly design files, while others appear to relate directly to Desai's work in quality control engineering and communications. Appendix to Third Am. Compl. And even if the design files do not directly intersect with Desai's previous or current work—a question that is too premature to answer at this stage of the case[17]—it still is plausible that a quality control engineer would use design secrets to perform quality control duties at Nidec.

On the third factor that courts examine when deciding whether the inevitable disclosure doctrine has been triggered, namely, actions the new employer has taken to prevent the incoming employee from using or disclosing the former employer's trade secrets, the record is silent. At this stage of the litigation, that silence is not surprising, because a complaint is not likely to contain any allegations about what, if anything, the competitor did to safeguard the plaintiff's secrets.

---

[17]Molon is correct that Nidec's argument on this point attempts "to make a substantive determination as to the value that [Nidec] may have derived from Mr. Desai's use, or the use of any employee at [Nidec] who may have had access, of the trade secrets," and that finding cannot be made one way or the other at the dismissal-motion stage. Molon's Resp. Br. at 6 n.3. *See, e.g., Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 962 (7th Cir. 1996) (a factual determination is "not the type of finding that is generally appropriately made on a motion to dismiss").

All told, Molon's allegations on the direct competition between the parties, as well as the allegations on the employment breadth and similarity of Desai's quality control work at the two companies, are enough to trigger the circumstantial inference that the trade secrets inevitably would be disclosed by Desai to Nidec. To be sure, going forward, Molon ultimately will bear the burden of *proving*—not just alleging—enough facts such that disclosure is not premised on a mere unsubstantiated fear. *PepsiCo, Inc.*, 54 F.3d at 1268-69; *Saban*, 780 F. Supp. 2d at 734; *Teradyne*, 707 F. Supp. at 357. For now, Molon has pled enough for the trade secrets claims to avoid the Rule 12(b)(6) chopping block.[18]

### D. Continuing Use

Nidec's final argument is that the federal Defense of Trade Secrets Act claim should fail because no acts occurred after the effective date of the Act, specifically, May 11, 2016. Nidec's Mot. to Dismiss at 9-10; Nidec's Reply Br. at 9-10. The key question is whether the inference of inevitable disclosure reasonably extends to continued use beyond the Act's effective date.

It is true that inferences should not be stacked on top of one another past the point of reasonableness and crossing the line into speculation. But that is not what is happening here. At least on the limited record—the Third Amended Complaint—

---

[18]It is worth noting that Nidec made a passing reference in its Motion to Dismiss to Molon's Second Amended Complaint, R. 18, and its ostensible failure to allege how Nidec was responsible for the actions of Desai. Nidec's Mot. to Dismiss at 5. This procedural commentary is not relevant here, but for the sake of completeness: Molon need not allege that Nidec was responsible for Desai's downloading *at the time* it happened in order to state a claim for trade secret misappropriation. It is enough that Desai (allegedly) later disclosed the information to Nidec and that Nidec made use of it, knowing (or having reason to know) that the secrets were acquired by improper means.

15

the alleged trade secrets are not of the nature that would necessarily go stale in the course of a couple of years. A motor design, and the quality control data associated with it, plausibly would retain its trade secret value well into the future. If it is plausible that some of the alleged trade secrets maintain their value today, then it is also plausible that Nidec would be continuing to use them. Of course, further discovery could upend any or all of this, but at this stage, continued use beyond the May 2016 effective date is plausible.

## IV. Conclusion

For the reasons discussed, Nidec's Motion to Dismiss Counts 3 and 4 is denied. The status hearing of June 1, 2017, is accelerated to May 18, 2017, at 9:15 a.m., to discuss the discovery plan on the trade secrets claims. The parties also should immediately start engaging in settlement negotiations, now that both the summary judgment motion and the dismissal motion have been decided.

ENTERED:

    s/Edmond E. Chang  
Honorable Edmond E. Chang  
United States District Judge

DATE: May 11, 2017

16