UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOLON MOTOR AND COIL CORPORATION, ) ) ) | |
| Plaintiff, ) ) | No. 1:16-CV-03545 |
| v. ) ) | Judge Edmond E. Chang |
| NIDEC MOTOR CORPORATION, ) ) | |
| Defendant. ) | |

## ORDER

Last year, the Court dismissed the remaining claims in this action, which were trade-secrets claims under federal and state law. 18 U.S.C. § 1836(b) (Defend Trade Secrets Act); 765 ILCS 1065 (Illinois Trade Secrets Act). *See* R. 64, 184.[1] The target of the trade-secrets claims, Nidec Motor Corporation, has now moved for attorney's fees. For the reasons explained in this Opinion, the motion is granted in part and denied in part.

## I. Background

Molon Motor and Coil Corporation filed this case in March 2016, alleging that Nidec (and related entities) had infringed two of Molon's patents. *See* R. 1. Not until May 26, 2016, when filing its Second Amended Complaint, R. 18, did Molon allege that Nidec had misappropriated trade secrets in violation of the federal Defend Trade Secrets Act and the Illinois Trade Secrets Act. These claims arose, in large part, from

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

the alleged misappropriation and disclosure of trade secrets by former Nidec employees Manish Desai and Jose Delgado. Sec. Am. Compl. ¶¶ 68, 72, 83; R. 64, Third Am. Compl. ¶¶ 67, 80. After Nidec filed a dismissal motion, Molon successfully asked for leave to amend the trade-secret claims to provide additional detail about the secrets. R. 63. In September 2016, Molon filed a Third Amended Complaint (which ended up being the final operative complaint), R. 64, which dropped conspiracy and tortious interference claims.

Manish Desai, Molon's Head of Quality Control, left Molon for Nidec in June 2013. Third Am. Compl. ¶ 58. Molon alleged that, before leaving, Desai copied onto an unauthorized thumb drive a "significant amount of files related to engineering and design, quality control protocols and data, and customer specific data for Molon Motors." *Id.* at 65. Molon alleged (incorrectly, as it turns out) that Jose Delgado, a quality control engineer, also had left for Nidec during the same year (2013). R. 205-5, Pl. Resp. Br., Exh. 5, Carlson Decl. ¶ 5; Sec. Am. Compl. ¶ 59. In reality, however, Delgado actually left Molon in 2010. R. 199, Def. Br. at 4. Molon removed any mention of Delgado from the Third Amended Complaint. *See* R. 205, Pl. Resp. Br. at 11.

In response to the new pleading, in October 2016, Nidec again moved to dismiss the trade-secrets claims. R. 67. The motion was denied. R. 81. By that point, the trade-secrets claims were the only remaining claims. The two counts of patent infringement (Counts 1 and 2), were defeated on summary judgment, R. 78, and dismissed on joint stipulation, R. 75, respectively.

2

In February 2019, Molon's then-attorney, John Petrsoric, requested leave to withdraw as counsel, citing reservations about the case, as well as personal issues. R. 205-1, Pl. Resp. Br., Exh. 1, Tr. of Proceedings 2/28/19 at 2:15-24; R. 155. The motion was granted in March 2019. R. 160. Previously, the Court had extended the fact discovery deadline from November 16 to December 21, 2018, in light of Petrsoric's personal circumstances. R. 151.

Molon retained new counsel and eventually moved to re-open discovery for two depositions: a 30(b)(6) deposition of Nidec, and a third-party deposition of Desai. R. 161, Pl.'s Mot. for Leave to Take Limited Discovery, ¶ 3. The Court denied the motion, noting this was "a paradigm case for holding a corporate litigant to its lawyer's alleged inaction." R. 173 at 2. Eventually, the Court dismissed the remaining claims, without foreclosing Nidec from seeking attorneys' fees for having to defend against the trade-secrets claims. R. 184. The Court cautioned Nidec to "have another very serious talk with your client before that motion is filed." R. 205-2, Pl. Resp. Br., Exh. 2, Tr. of Proceedings 7/1/19 at 5:14–15. Nidec decided to file the motion, to which the Court now turns.

## II. Analysis

### A. Bad-Faith Standard

The Illinois Trade Secrets Act allows a defendant to recover attorney's fees if "a claim of misappropriation is made in bad faith."[2] 765 ILCS 1065/5. But the Act

---

[2] As Nidec states in their motion, the federal Defend Trade Secrets Act also allows recovery for attorney's fees where a misappropriation claim is made in bad faith. *See* Def. Br at 8–9; 18 U.S.C § 1836(b)(3)(D). For some reason, however, Nidec failed to develop any

3

does not explicitly define what constitutes "bad faith." The most pertinent Illinois decision on what bad faith means under the Act is *Conxall Corp. v. Iconn Sys., LLC*, 61 N.E.3d 1081 (Ill. App. Ct. 2016). In that case, by a 2-to-1 majority, the panel declined to adopt the two-part test established in California case law interpreting the Uniform Trade Secrets Act. *Id.* at 1088. Under the "California" standard, as *Conxall* labelled it, "bad faith" requires both "objective speciousness" and "subjective bad faith." *SASCO v. Rosendin Elec., Inc.*, 207 Cal. App. 4th 837, 845 (2012). In other words, the movant must show not only that the plaintiff acted with a culpable state of mind (subjective bad faith) but must also show that the claims were objectively frivolous (objective speciousness).

Instead of that two-part test, the *Conxall* majority appeared to criticize the objective-frivolousness element, reasoning that the Act's text requires only "bad faith" and there is no textual anchor in the Act for requiring "objective speciousness." 61 N.E.3d at 1101. *Conxall* also noted that the Illinois Trade Secrets Act, although modeled on the Uniform Trade Secrets Act, did not adopt a drafters' comment that the California decision relied on. *Id.* The panel majority concluded that "bad faith" under the Act "should be given the preexisting definition of 'bad faith' of this state." *Id* at 1102.

Unfortunately, the Act's usage of "bad faith" actually had not been authoritatively interpreted by the Illinois Supreme Court. So *Conxall* turned to an Illinois Supreme Court decision, *Krautsack v. Anderson*, 861 N.E.2d 633, 648 (Ill. 2006), in

---

argument for its entitlement to attorney's fees under federal law. So Nidec has forfeited recovery on that basis.

4

which the state high court interpreted the Illinois Consumer Fraud Act. The Consumer Fraud Act authorizes fee-shifting to the prevailing party, but the Illinois Supreme Court interpreted the fee-shifting provision to require a finding of "bad faith" for a prevailing *defendant* to recover fees (whereas plaintiffs need not make that showing if they win). 861 N.E.2d at 646–47. The next question was how to define "bad faith."

On that question, *Krautsack* refused to limit bad faith to the confines of Illinois's general litigation-sanctions rule, namely, Illinois Supreme Court Rule 137. 861 N.E.2d at 648. Rule 137 requires that every signed *filing* have a reasonable basis in fact and in law, and also the filing must not be made for any improper purpose:

> The signature of an attorney or party constitutes a certificate … that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument …, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation … .

Ill. S. Ct. R. 137. The Illinois Supreme Court reasoned that Rule 137 applies only to *filings*, but the Consumer Fraud Act's fee-shifting provision was not so confined. *Id.* So *Krautsack* held that, under the Consumer Fraud Act, it is possible to establish a plaintiff's bad faith by proving misconduct outside of the pleadings. *Id.*

Returning to *Conxall* and the Illinois Trade Secrets Act, the panel majority concluded that, like the Consumer Fraud Act, it is possible to show that a plaintiff acted in "bad faith" *without* satisfying Rule 137—which has both an objective ("reasonable inquiry" into the basis for the facts and the law) and a subjective ("improper purpose") requirement. 61 N.E.3d at 1103. Still, *Conxall* noted that Rule 137 and the

5

case law interpreting it will be useful guidance in deciding whether a plaintiff has acted in bad faith for purposes of the Illinois Trade Secrets Act. *Id.*

As a practical matter, in this case, it matters not whether the Act's "bad faith" standard requires more than just subjective culpability. Nidec argues that Molon brought trade-secret claims that had no reasonable basis in law or fact *and* that Molon acted with subjective bad faith to harass Nidec. Indeed, in most cases—including this one—fee applicants try to prove objective frivolousness anyway, because it is one of the most powerful forms of circumstantial evidence to prove *subjective* bad faith. Here, as explained next, the record evidence does show that Molon's trade-secret claims were both objectively frivolous and brought with subjective bad faith.

### B. Evidence of Bad Faith

With this standard of bad faith in mind, it is time to examine the record evidence.

### 1. The Three-Year Delay

First, Nidec points to Molon's delay in even mentioning the trade-secret claims, let alone actually filing them as part of a lawsuit. Remember that Desai, who supposedly stole the trade secrets, left Molon in June *2013*. Third Am. Compl. ¶ 58. Shortly after he left, Molon hired a forensic consultant, Christopher Tragasz, to examine the Molon hard drive that Desai used. R. 207-3, Tragasz Aff. ¶ 7.[3] This is when Molon first became aware of alleged misappropriation, if Molon's interrogatory responses in

---

[3]The parties filed various affidavits and exhibits under seal, but the evidence discussed in this Opinion cannot remain from public view given the strong presumption of public access to facts that are relied on as a basis for judicial decision-making.

this case are to be believed. R. 207-2 at 18-19. Tragasz signed an affidavit, dated October 8, 2013, averring to his findings. *See* Tragasz Aff. The affidavit said that "documents potentially belonging to Molon were accessed in close proximity to Manish Desai's resignation on a removable device." *Id.* ¶ 13. Perhaps not surprisingly, this tepid conclusion did not result in Molon leaping into action. One year went by, then two. In March 2016, almost 2½ years after the forensic analysis, Molon sued Nidec—but for unrelated patent infringement, not on the trade secrets. *See* R. 1. It was not until May 2016 that Molon added the trade-secret claims to the case. *See* Sec. Am. Compl. ¶¶ 55–84.

The three-year delay in bringing the trade-secret claims raises a burning question: if Molon really had reason to believe that Desai potentially possessed trade secrets, then why the delay? This is an important question because the longer the delay, the stronger the circumstantial inference that, in reality, Molon had no reason to believe that Desai was truly disclosing trade secrets to Nidec. Molon's response: (a) this case is complex and (b) the trade-secret claims were filed within the statute of limitations. Pl. Resp. Br. at 9–10. Those explanations do not hold water.

On complexity, Molon offers no persuasive reason why the case was so complex, either factually or legally, that it would take three years to bring the case, yet all the while supposedly Desai was disclosing the trade secrets to Molon's competitor, Nidec. Of course, it can be self-defeating to discuss trade secrets in detail on a public docket, but nothing in the sealed filings (or the sealed parts of filings) explains why any factual or legal issue necessitated three years' worth of work to file the claims. On filing

7

within the statute of limitations, it is not as if the Illinois General Assembly picked a statute of limitations period for the Illinois Trade Secrets Act on the notion that any claim brought within that period meant that the claim was brought in good faith.

If Molon had other reasons for the delay—be they strategic, a constraint on the legal budget, or anything else—it could have said so. But Molon did not. The three-year delay in bringing the trade-secret claims—indeed, the delay in even trying to confront Desai and Nidec about the purported trade secrets—is strong circumstantial evidence of both a lack of a reasonable basis for the claims and an improper purpose of frivolously raising the stakes of the patent-infringement claims.

### 2. Inevitable Disclosure

In a similar vein, Nidec contends that Molon brought and maintained its claims without a good-faith basis to believe that *Nidec*—as distinct from Desai—ever acquired, disclosed, or used Molon's trade secrets. Def. Br. at 11. Against this, Molon relies on the doctrine of inevitable disclosure, which allows a plaintiff to prove trade-secret misappropriation by demonstrating that a former employee inevitably would disclose trade secrets to the new employer given the former employee's job duties and knowledge. Third Am. Compl. ¶ 67; *Strata Mktg., Inc. v. Murphy*, 740 N.E.2d 1166, 1178 (Ill. App. Ct. 2000). Again, this explanation falls short given the circumstances of this case.

It is one thing to rely on inevitable disclosure at the pleading stage, which Molon successfully did here in fending off a dismissal motion. But in October 2018, Molon admitted in responses to interrogatories that it was "unaware of any actual losses

8

resulting from Nidec's use of Molon's trade secrets either through generally known market activity or through Molon's own customer relationships." R. 207-2 at 23. Although this admission was made after the trade-secret claims were pleaded, Molon does not explain what changed between the May 2016 filing of the claims to October 2018 that made Molon realize that no harm had befallen Molon—and if genuine trade secrets were at issue, and Nidec had used them, then by definition Molon would have been harmed. It was not.[4]

Molon also argues that it had "a good-faith belief that Mr. Desai downloaded Molon's trade secret information shortly before leaving Molon." Pl. Resp. Br. at 9. That, at least, is somewhat supported by the Tragasz Affidavit. But Molon did not sue Desai; it sued *Nidec*. So the inevitable-disclosure doctrine was crucial to bringing the trade-secret claims in this case. Yet Molon had no reasonable basis to plead the application of the doctrine.

To be sure, Molon's weak reliance on the inevitable-disclosure doctrine is not, by itself, strongly probative of bad faith. But here, when the weakness of that contention is combined with the three-year, unexplained delay in bringing the trade-secret claims, plus Molon's lack of any basis to believe that it had been harmed, R. 207-2 at 23, the evidence does serve as another piece of circumstantial evidence of bad faith.

---

[4]As purported evidence of inevitable disclosure, or at least a reasonable basis for asserting it, Molon points out that Desai's November 2017 declaration did mention that "there have been a few times that I was curious about what I had done at Molon, and accessed [his] thumb drive contents." R. 164-2, Exh. A, Desai Decl. ¶ 9. But that is not an admission that Desai used trade secrets in carrying out his job duties at Nidec, and indeed he denied disclosing any trade secrets repeatedly throughout the same declaration. *Id*. ¶¶ 5–8, 10.

### 3. Delay in Disclosing the 2013 Analysis

In the most shocking piece of evidence of bad faith, Molon waited until the briefing of *this* very fees motion to finally share the *2013* forensic analysis of Desai's hard drive. *See* Tragasz Aff. By Molon's own admission in an interrogatory response, this was the crucial analysis that initially alerted Molon to the potential misappropriation of trade secrets by Desai. R. 207-2 at 18–19. Yet, despite Nidec's routine discovery request for this type of document, *see* R. 199-8, Pl. Resp. to RFP ¶ 61, Molon never produced the Tragasz Affidavit during discovery. Instead of producing the written analysis, Molon produced what it deemed a forensic copy of Mr. Desai's hard drive. R. 199-1, Watson Decl. ¶¶ 1–2. Nidec retained an e-discovery company to review the copy of the hard drive. *Id.* According to a declaration submitted by the analyst, Lance Watson, the hard-drive copy did "not contain information necessary to make a conclusion regarding any activity of the files present, including a determination if a mass download had occurred." *Id.* ¶ 4. Watson averred that the data did "not meet the standards I would expect for a forensic copy." *Id.* ¶ 3. So the copy of the hard drive was hardly a substitute for the 2013 Tragasz Affidavit. Indeed, even if the hard drive had all the forensic-data bells and whistles that would allow Nidec's expert to draw forensic conclusions, still there would be no basis to withhold the Tragasz Affidavit.

Molon offers no reason why the 2013 analysis was not disclosed during discovery. Zero. Molon makes no assertion, for example, that it withheld production on the basis of attorney-client or work-product privilege. The absence of an explanation,

10

combined with the lack of a smoking gun in the analysis, strongly suggests that Molon knew that the analysis did not support the trade-secret claims against Nidec (or, for that matter, any potential claim against Desai). Over the course of five months in 2013, only 18 files were downloaded by Desai from Molon hard drives to a thumb drive, including mundane files like a cover letter, an employment agreement, and a resignation letter. *See* Tragasz Aff., Exh. B. By withholding the Tragasz Affidavit and its exhibits, Molon was able to vaguely allege that that, on "multiple occasions" before his resignation, Desai copied a "significant amount" of files. Third Am. Compl. ¶ 65. Again, this is not to excuse Desai for potentially breaching his employment agreement by downloading files to take home to work on, but the unexplained concealment of the Tragasz Affidavit is strong evidence that Molon knew that its trade-secret claims were brought in bad faith.

### 4. Delgado's Departure Date

There is one final piece of evidence of bad faith. Remember that Molon alleged that Jose Delgado, a quality-control engineer, left Molon for Nidec in 2013. Sec. Am. Compl. ¶ 59. Molon cast Desai and Delgado in a "conspiracy" to "copy files from their Molon work computers. This was done for nefarious purposes." *Id.* ¶ 68. To buttress this allegation of conspiracy, Molon described Delgado's quality-control duties, *id.* ¶ 63, and then grouped Desai and Delgado together in describing the post-employment restrictions on their disclosure of trade secrets, *id.* ¶¶ 64–65. Molon then alleged that "their respective computers" were accessed "[s]everal days" before they left, and

11

"significant amounts of data from those computers were downloaded to portable drives." *Id.* ¶ 67.

The problem is that Delgado left Molon in 2010—not 2013. R. 199, Def. Br. at 4. That three-year gap significantly undermines the allegation of a "conspiracy" between Desai, Delgado, and Nidec. Of course, everyone makes mistakes. It is easy to imagine, for example, a human resources employee pulling the wrong departure year from the personnel file, or that there simply was a typo along the way in communicating the year of departure to Molon's lawyer. But Molon offers the most conclusory explanation possible for the mistake, simply stating in its lawyer's declaration that Molon "inadvertently misstated" the year and the mistake was "not brought in bad faith." Carlson Decl. ¶¶ 5–6. But what investigation into the source of the error did Molon undertake to arrive at that conclusion? Did the lawyers consult their notes or emails from around the time of the pleading's drafting? Is there something in Delgado's personnel file, whether a typo there or a 2013 document or something else, that is the likely culprit for the mistake? Molon offers no concrete facts of any kind and offers no description of the inquiry that generated the conclusion of inadvertence. What the Court is left with is an unexplained allegation of a Desai-Delgado-Molon conspiracy that had no reasonable basis in fact. To be sure, the Delgado-conspiracy angle was dropped a few months later, but its inclusion in the first place is evidence of bad faith infecting Molon's other litigative conduct.

For all those reasons, the Court finds that Molon acted in both objective and subjective bad faith in bringing and maintaining the trade-secret claims against

12

Nidec. Molon waited 2½ years to bring the trade-secret claims because they were baseless, withheld the Tragasz Affidavit because it showed the weakness of the claims, and alleged a false departure date to pin a baseless conspiracy on Desai, Delgado, and Nidec. Nidec is entitled to attorney's fees for defending against the trade-secret claims.

### C. Cutoff Date

Nidec, however, has its own explaining to do on a late disclosure that could have helped prevent further litigation on the trade-secrets claims as of December 1, 2017. On around November 14, 2017, Nidec's lead counsel met with Desai. R. 164-2, Telscher Decl.¶¶ 1–2. After that meeting, Desai provided defense counsel with a written declaration, which he signed on December 1, 2017. *See* R. 164-2, Exh. A, Desai Decl. In it, Desai averred that he never disclosed Molon's confidential information to Nidec. *Id*. ¶¶ 5–10. Following the meeting, Desai also provided Nidec's counsel with the thumb drive used to access files on the Molon hard drives that Desai had used when working there. Telscher Decl. ¶ 4. Having analyzed its contents, Nidec's counsel found that the thumb drive largely contained personal files, and some Molon documents, albeit copied over a period of years. R. 164-1, Schmalfeld Decl. ¶ 6.

But Nidec waited until August 30, *2018* to produce the declaration and a forensic copy of the thumb drive. Schmalfed Dec. ¶¶ 4, 7. This time, it is Nidec that fails to offer an explanation for glaring inaction. It is likely that earlier production of the declaration would have led to an earlier conclusion to the trade-secret claims and prevented whatever work was expended on them in the interim. Indeed, after the

13

production of the Desai declaration, the Court held a status hearing on November 19, 2018. R. 151; R. 185, Tr. of Proceedings 11/19/2018. Nidec's counsel explained that "there hasn't been any evidence of use of these trade secrets." Tr. of Proceedings 11/19/2018 at 4:17-18. The lawyers had discussed Molon taking a few depositions to "vet that," and then "there's a chance this case could go away altogether by the end of this month potentially." *Id.* at 4:19–24. It turned out that Molon did not end up taking any depositions, *see* R. 161 at 1, and the Court's notes reflect that Molon's counsel reported, at the January 15, 2019 status hearing, R. 153, that Molon had undertaken further investigation of the thumb drive and would likely voluntarily dismiss the claims.

Based on the record, then, a timely disclosure of the Desai declaration and the thumb drive would probably have cut off the litigation much sooner. In exercising its discretion to consider any relevant factor in awarding fees, *see Krautsack*, 861 N.E.2d at 644, the Court finds that any trade-secrets defense fees incurred by Nidec after December 1, 2017—the execution date of the Desai declaration—shall not be shifted to Molon.

### III. Conclusion

Nidec's motion for fees is granted in part and denied in part. Nidec is entitled to attorney's fees for defending the trade-secret claims, but only through December 1, 2017. The parties shall start the Local Rule 54.3 fee-petition process so that the specific amount of the fees can be determined. The date of this Order's entry on the docket shall be considered as the equivalent of the judgment date as the springboard

for the schedule in Local Rule 54.3(d) and ultimately for the Local Rule 54.3(e) Joint Statement's deadline. Of course, the Court urges the parties to put this case to bed once and for all by engaging in good-faith settlement negotiations. To incur more time and expense on a fee petition probably would disserve both sides. The tracking status hearing of December 11, 2020, is reset to December 18, 2020, at 8:30 a.m., but to track the case only (no appearance is required, the case will not be called). Instead, the parties shall file a joint status report on December 11, 2020, proposing the specific deadlines under Local Rule 54.3 (and the parties may propose appropriate extensions to those deadlines in light of the holidays and, hopefully, in light of settlement negotiations).

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 30, 2020